Larry HALE, Linda Hale, Appellees,

v.

FIRESTONE TIRE & RUBBER COMPANY, The Budd Company, Appellant.

No. 86–1679.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1986.

Decided June 4, 1987.

Thomas P. Shult, Kansas City, Mo., for appellant.

John C. Risjord, Kansas City, Mo., for appellees.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BOWMAN, Circuit Judge.

HEANEY, Circuit Judge.

The Budd Company (Budd) appeals from a final judgment entered in the United States District Court for the Western District of Missouri upon a jury verdict in an exploding rim case brought by Larry Hale and his wife, Linda Hale. The Hales were awarded $1,733,800 in actual and punitive damages from Budd. For reversal, Budd argues that the district court abused its discretion in 1) admitting into evidence a videotape prepared by the Hales' counsel depicting a mannequin being "killed" by a rim separation; 2) denying Budd's motion for a mistrial prompted by counsel for the Hales alleged "spectacle" during trial; 3) admitting evidence of other accidents involving RH5° multi-piece rims; 4) its rulings on testimony as to whether the tire rim introduced into evidence was the actual rim that caused Larry Hale's injuries; and 5) denying Budd's motions for directed verdict and judgment notwithstanding the verdict on the issue of punitive damages. Budd also asserts it was deprived of a fair trial because the trial court was biased against the RH5° rim and was frustrated in having to preside over the third trial of this case. We affirm in part and reverse in part.

## I. BACKGROUND.

Larry Hale was injured on October 4, 1977, when a RH5° multi-piece tire rim separated under pressure and struck him. The accident occurred while Hale was inflating a tubed tire mounted on the outer dual RH5° rim of his 1968 Ford F–600 ten-wheel truck. The RH5° rim consists of three parts: a rim base, a side ring, and a disc. Firestone manufactured the rim base and side ring. Budd manufactured the disc, attached the disc to the Firestone rim, and sold the rim/disc combination.

In 1978, the Hales brought an action against Firestone on a strict liability theo-

ry. Budd was added as a defendant in 1982. After approximately a two-week jury trial, the Hales were awarded $4,290,-000 in actual and punitive damages from Firestone and Budd. Firestone and Budd appealed, and this Court reversed the judgment. *See Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322 (8th Cir.1985) (*Hale I*).

In 1985, the parties tried the case a second time before the same district court judge, the Honorable Scott O. Wright. After another approximately two-week trial, Judge Wright declared a mistrial when the jury could not decide whether Plaintiff's Exhibit 1 was the rim involved in the accident.

Just prior to the third trial, Firestone and the Hales reached a settlement for $625,-000. The third two-week trial before Judge Wright began against Budd alone on March 3, 1986. The jury awarded Larry Hale $679,000 and Linda Hale $225,000 in actual damages and assessed $1.5 million in punitive damages. The jury also found that Larry Hale was five percent at fault for his injuries. After deducting five percent and crediting Budd $625,000 for the Firestone settlement, the court entered judgment in favor of the Hales in the amount of $1,733,800. 636 F.Supp. 585. Budd appeals.

## II. ANALYSIS.

### A. The Videotape.

Budd first argues that the district court abused its discretion in permitting the Hales to show the jury a four-minute videotape depicting a tire rim separation. The videotape was prepared by the Hales' counsel with the assistance of a cameraman and the Hales' expert witness, consulting engineer Donald Gibson. Using a life-size mannequin, the tape depicts a man, crouched next to a truck, filling a tire with air. The tire then explodes, striking the mannequin and hurling it approximately ten feet in a cloud of smoke. The explosion is repeated two more times and concludes with a closeup shot of the mannequin's face.

Budd argues that 1) the videotape exaggerated the force of explosion because the

experimental tire was inflated to approximately seventy-five pounds per square inch (psi) while the accident tire was inflated to no more than fifty-five psi, and 2) the four-minute trial tape is an edited summary of two days of filming, and Budd was not afforded an opportunity to view the "master" tape. In countering Budd's assertions, the Hales argue that: 1) the twenty psi difference between the experimental explosion and the real explosion is only slight, and 2) there is no complete tape of the filming because the cameraman simply taped over the approximately six attempts required to achieve the explosion depicted in the trial tape.

This Court considered the law regarding evidence of experiments in *Hale I:*

> Evidence of experimental tests is not admissible unless a foundational showing is made that the tests were conducted under conditions substantially similar to actual conditions. The admissibility of such evidence rests largely in the discretion of the trial judge and his decision will not be overturned absent a clear showing of an abuse of discretion.

*Hale I,* 756 F.2d at 1333 (quoting *Collins v. B.F. Goodrich Co.,* 558 F.2d 908, 910 (8th Cir.1977)). *See Petty v. Ideco, Division of Dresser Industries, Inc.,* 761 F.2d 1146 (5th Cir.1985).

In our view, the district court did not abuse its discretion in permitting the videotape to be introduced in evidence. According to the Hales' expert, the mannequin in the film was approximately the same size and weight as Larry Hale. The mannequin was crouched next to an RH5° rim and tire on the axel of a truck, just as Larry Hale was at the time of the accident. Although the tire in the experiment was inflated to twenty more pounds per square inch than the tire in the accident, this difference does not render an otherwise substantially similar demonstration inadmissible, but rather goes to the weight of the evidence. The tire in the experiment was one size smaller than the tire on Larry Hale's truck, 900 × 20 rather than 1000 × 20, and, according to the Hales' expert Dr. Donald Gibson, the explosion force of the smaller tire is somewhat less than the force of the larger tire. Tr. 724. We are satisfied that the trial court balanced the tire size differential against the psi differential and did not abuse its discretion in determining that "the videotape demonstration was relevant because it was made under conditions *very similar* to the conditions involved in the actual accident." District court order denying new trial at 1 (April 25, 1986). Additionally, Budd had ample opportunity to cross-examine Dr. Gibson as to the consequences of the difference in inflation pressure and tire size but chose not to explore those differences.

■ Finally, the trial court's finding that "the master tape was not intentionally withheld from defendant, but instead was unavailable because it had been erased during the editing process" was not clearly erroneous. While it would have been better had the Hales' counsel instructed the cameraman to save all the film footage, Budd was not prejudiced by this omission. Budd had every opportunity to cross-examine Dr. Gibson as to the number of attempts required before the tire exploded.

### B. The Alleged Spectacle.

■ Budd argues that the trial court abused its discretion in not declaring a mistrial based on an alleged "spectacle" staged by the Hales' counsel concerning the threat posed to all present in the courtroom by Budd's exhibit, a "loaded" RH5° tire and rim.

The exhibit consisted of two RH5° rims and tires mounted on an axle. Brought into the courtroom on the morning of the sixth day of trial, the exhibit was introduced to assist Budd's expert, Dr. Robert Harold, in his testimony that Plaintiff's Exhibit 1, a tire rim assembly, could not be the accident rim. Budd claims the tires were inflated in order to keep the parts properly aligned while Dr. Harold referred to the exhibit during his testimony.

Budd alleges that counsel's prejudicial spectacle occurred just after Budd introduced the exhibit. Upon learning that the tires contained air, the Hales' counsel exclaimed: "[W]e object to subjecting every-

body in the courtroom to this product if its got air in it, Your Honor. I think we should deflate them if they have air in them, especially since the witness doesn't know how much air is in them." Tr. 874. A short while later, he exclaimed: "Why should the jury and the rest of us have to take that chance?" Tr. 874–75.

Budd's counsel replied: "If I thought there was even any chance at all, any chance at all I certainly wouldn't do anything of that kind. * * * I'll stand in front of it and face it this way." Tr. 875. Later, the Hales' counsel stated: "[C]ounsel said he was willing to take a chance but I don't think my client and his wife have to and I don't think this jury should have to." Tr. 875.

A bench conference followed this interchange during which Budd's counsel explained: "If this wheel blows up the case is over, and there's not going to be anybody hurt and that's the whole thing." Tr. 876. The trial court allowed Budd's counsel to continue with his direct examination of Dr. Harold. The inflated wheel remained in the courtroom.

A short time later, Budd's counsel asked Dr. Harold to remove the wheel from the axel. The Hales' attorney interjected: "Is it necessary to do it while it's aimed at the jury? Can't we aim it at the Budd Company table if they want to take the chance, your Honor?" Tr. 882–83. The court did not respond, and Budd's attorney continued to examine the expert. During this time, apparently, the Hales' attorney moved his clients to "safer" spots in the courtroom away from the exhibit.

Budd argues that this "spectacle" distracted the jury from expert testimony on the issue that resulted in a hung jury in the second trial—whether exhibit 1 was the accident rim. Budd also argues that the unfair prejudice was reinforced by the counsel's reference to the danger caused by the exhibit during cross-examination despite the court's direction not to mention the incident at cross-examination. Tr. 953. Budd essentially argues that the court 1) failed to control the Hales' counsel; 2) failed to enforce its instructions that coun-

sel not improperly comment; and 3) failed to instruct the jury that they should disregard the "spectacle" or that the court believed both sides were responsible.

In our view, the trial court did not abuse its discretion in denying Budd's motion for a new trial. The trial court admonished both counsel for mistakes and improper conduct, and our careful review of the record supports the adequacy of this action. The record reveals that the trial court cited Budd for failing to make adequate arrangements for the use of a potentially dangerous product, and we can see no reason to question the trial court's judgment on this matter. It is "fundamental that where the defendant 'opened the door' and invited error, there can be no reversible error." *Federal Crop Insurance Corp. v. Hester*, 765 F.2d 723, 727 (8th Cir.1985) (quoting *United States v. Steele*, 610 F.2d 504, 505 (8th Cir.1979)); *see Mid-America Food Service v. ARA Services*, 578 F.2d 691, 696 (8th Cir.1978). The trial court's rationale in denying Budd's motion for a new trial on this point is persuasive:

> The Court is of the opinion that counsel for plaintiffs failed to exercise reasonable diligence in discovering and bringing to the Court's attention the fact that there was an inflated RH5° wheel assembly in the courtroom. However, the Court does not agree with defendant's characterization of the conduct of plaintiffs' counsel as a "tactical ploy that was *calculated* to frighten the jury." Suggestions of the Budd Company in Support of Motion for New Trial, at p. 3 (emphasis in original). Moreover, in the Court's view, any misconduct by plaintiffs' counsel pales in comparison to the misconduct of defendants. Having observed the entire incident, the Court is convinced that defendant brought the inflated RH5° wheel assembly into the courtroom not to demonstrate anything relevant to this case, but instead to improperly and prejudicially buttress its position that the RH5° wheel rim is a safe product.

Counsel for Budd have admitted that they would not have brought the wheel

assembly into the courtroom "unless *they* were *absolutely* convinced that it was *totally* safe." Suggestions of the Budd Company in Support of Motion for New Trial, at p. 4 note 2 (emphasis added). In point of fact, however, the evidence in this case suggested that RH5° wheel rim is not "totally safe" even after it has been inflated. In pre-trial hearings, the Court became aware of numerous incidents where already-inflated RH5° wheel rims explosively separated while being rolled across the floor or mounted on an axle. Thus, there *was* a substantial risk of harm created by Mr. Harold's jostling and banging of the inflated RH5° wheel rim assembly in the courtroom.

Defense counsel was present at the pre-trial hearings and was fully aware of the incidents described therein. Nevertheless, defendant Budd chose to bring a "loaded" RH5° wheel into the courtroom in order to demonstrate, in the most graphic terms imaginable, its absolute confidence in the safety of its product. If plaintiffs reacted with surprise and fear to the presence of an inflated RH5° wheel in the courtroom, defendant Budd has no one but itself to blame.

It bears emphasis that there was absolutely no reason to have a tire—much less an inflated tire—on the RH5° rim assembly in order to demonstrate the point Mr. Harold was supposedly making. On the surface, Mr. Harold was attempting to demonstrate how the metal wheel rim would react depending on whether it was mounted on the inside or outside dual; his demonstration was in no way dependent on the presence of an inflated tire. Thus, the Court stands convinced that defendant Budd was, in effect, trying to sneak an inflated RH5° wheel into the courtroom for the improper purpose of showing the jury that there was nothing to be afraid of. In fact, and as the evidence showed, however, there was plenty to be afraid of. Whatever spectacle ensued was of defendant's creation.

District court order denying new trial at 4–6 (April 25, 1986).

## C. Evidence Concerning Other Accidents.

In *Hale I,* this Court held that the trial court erred in permitting the Hales to comment about other tire rim accidents without first laying a foundation that they were substantially similar to the accident involving the Hales. *Hale I,* 756 F.2d at 1332. Consequently, a four-day hearing was held in which plaintiffs attempted to lay a foundation consisting of over two hundred prior accidents. After the hearing, the parties stipulated that of the approximately sixty other incidents reported to Budd as of 1985, thirteen had been known to Budd prior to October 4, 1977, and were substantially similar to Hale's accident. The magistrate ruled that these thirteen other accidents were admissible only to show that Budd had received notice of the claims and not to show proof of defect. Budd claims that the trial court abused its discretion 1) by allowing the Hales to introduce "other accidents" not deemed admissible by the magistrate; 2) in failing to give a proper limiting instruction; and 3) by not allowing Budd to explain the disposition of the thirteen accidents that were properly admitted into evidence.

### 1. *Other Accidents Deemed Inadmissible.*

■ Primarily, Budd objects to the Hales' attorney's cross-examination of Budd's expert Dr. Harold about dissimilar accidents about which he had no knowledge. The Hales claim that the evidence of other accidents was properly admitted by the trial court to question Harold's qualifications, disprove his theories, and impeach his testimony. We agree.

The direct testimony of Dr. Harold spans approximately 112 pages of the voluminous record and the cross-examination covers approximately 122 pages. Throughout his testimony, Dr. Harold remained unyielding in his opinion of the RH5°: "My opinion is that the RH5° is a safe design. I've analyzed it, I've tested it extensively and I believe it is a safe design. It functions very well, it sustains rather severe abuse

and in my opinion it is a safe design. I have no problems with it at all." Tr. 963–64. Budd cites only seventeen pages of improper cross-examination of this expert. On those pages, the Hales' counsel refers only briefly to other accidents. Dr. Harold was familiar with some of the accidents. This evidence was proper for impeachment purposes under the facts of this case where this expert delivered vast and comprehensive testimony as to the safety of the RH5° design.

■ Additionally, Budd points to the testimony of Donald Greer, a witness for the Hales, about witnessing a wheel explosion as a young boy which he remembered to be an RH5°. Greer testified that, in approximately 1959, he saw a man killed by an exploding tire, even though the man was in a safety cage while working on the tire. The trial court determined that this evidence was admissible to rebut the issue raised by Budd that it was common knowledge in the industry that safety cages would protect individuals from potential harm involved in working on a tire. We find no abuse of discretion in admitting this testimony.

### 2. *The Limiting Instruction.*

■ Budd claims the trial court failed to give a proper limiting instruction as to the weight that could be given to the fact that Budd had received notice of thirteen accidents by the time Hale was injured. The instruction is as follows:

> [T]he stipulation and the reports that were just read to you here are for the purpose of notice of the allegations of claims of defect in the RH5° rim related to the issues in this case.

Budd claims the instruction was inadequate under Fed.R.Evid. 105 because it did not contain limiting language, advising the jury that it could *not* consider the accidents as proof of defect or causation. Rule 105 provides in relevant part that "[w]hen evidence which is admissible * * * for one purpose but not admissible * * * for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accord-

ingly." While it would have been better had the trial court specifically directed the jury not to consider the evidence as proof of defect, the court's instruction does not constitute an abuse of discretion. Rule 105 does not require all limiting instructions to contain prohibited use language. *See Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112, 1117 (8th Cir.1985).

### 3. *Evidence of the Disposition of the Thirteen Claims.*

■ Finally, Budd claims that the district court abused its discretion in not allowing it to introduce evidence of the disposition of the thirteen claims to put in proper perspective the significance of the notice of claims. Budd attempted to introduce evidence that it was aware of only six of the thirteen accidents; that it was not even sued in five of those six cases and was dismissed in the sixth; and that of the six cases, four had gone to trial and all four had resulted in verdicts for Firestone.

The trial court excluded this evidence under Fed.R.Evid. 403, finding that the prejudicial effects of this evidence outweighed its probative value. While this was a very close call, and while this Court would have been inclined to admit this evidence, we are not prepared to say that its exclusion was an abuse of discretion. However, if this case is retried, the evidence should be admitted.

### D. Testimony Concerning the Accident Rim.

■ Budd next claims the trial court made two erroneous rulings which prevented it from effectively challenging Exhibit 1 and proving to the jury that it was not the accident rim.

First, the court refused to permit Budd to introduce an excerpt from Firestone's engineer Robert Lee's testimony at the second trial. The testimony, essentially, was that Hale gave Lee a tire alleged to be the inner dual tire (connected to the accident tire) that was a different size from the tire he presented to his own expert, Dr. Gibson, alleging it also to be the inner dual. In our view, the trial court did not abuse its dis-

cretion in excluding this evidence. It would only have confused the jury to introduce Lee's testimony concerning the inner dual tire when the accident tire was an outer dual. Indeed, even the trial court was confused as to this point. Tr. 766–70.

Budd next claims that the trial court erred in permitting Linda Greer to testify as a rebuttal witness. Budd objected to the admission of Greer's testimony on the grounds that she was not a proper rebuttal witness and that the Hales had never listed her as a potential trial witness.

"Allowance of a party to present additional evidence on rebuttal depends upon the circumstances of the case and rests within the discretion of the individual most able to weigh the competing circumstances, the trial judge." *Smith v. Conley*, 584 F.2d 844, 846 (8th Cir.1978) (quoting *Skogen v. Dow Chemical Co.* 375 F.2d 692, 705 (8th Cir.1967)). Judge Wright listened to the arguments of both counsel as to whether Linda Greer was a proper rebuttal witness. The Hales' counsel argued that Greer's testimony would rebut the testimony of the primary defense witness that Exhibit 1 could not be the accident rim. The trial court accepted this argument, and we cannot say that it abused its discretion in so doing.

### E. Punitive Damages.

Budd claims the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict on the issue of punitive damages. Budd argues that the evidence was insufficient as a matter of law to submit the punitive damages claim to the jury on either the defective design or failure to warn theory because the Hales did not prove that Budd acted with reckless disregard for the safety of others.

The standard for granting a motion for a directed verdict is whether the evidence, when viewed in the light most favorable to the moving party, is such that reasonable persons could only conclude that the movant should prevail. *Hale I*, 756 F.2d at 1336. The standard for granting judgment notwithstanding the verdict is precisely the same as the standard for directing a verdict. *See* 9 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2537 (1973).

We hold that the district court did not err in denying Budd's motions. The evidence which indicated that an engineer for Budd notified the company of safety problems associated with the RH5° as early as 1953, three years before the rim in question was sold, was sufficient to create a jury question as to whether Budd acted with reckless disregard as to the safety of others in selling the rim.

We are troubled, however, by the size of the punitive damage award. In our view, it is grossly excessive and was due, in part, to the manner in which the tire rim exhibit was handled by counsel for the Hales. We feel that the punitive damage award was clearly caused, at least in part, by passion and prejudice on the part of the jury and that a new trial is necessary unless the plaintiffs consent to a remittitur in punitive damages of $1 million.[1]

We realize that the general rule is that where a punitive damage award is the result of passion and prejudice, a new trial is required and that a remittitur is not an appropriate remedy. *See* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2815 (1973). We feel, however, that we have a unique situation here. This case has already been tried three times: the first time, the jury returned a verdict in favor of the plaintiff, and this Court re-

---

1. Missouri has abolished the use of the remittitur noting that the practice is frought with confusion and inconsistencies. *Firestone v. Crown Center Redevelopment Corp.,* 693 S.W.2d 99, 110 (Mo.1985). It has been challenged as an invasion of a party's right to a jury trial and an assumption of power to weigh the evidence. *Id.* The Missouri Supreme Court, therefore, concluded that given the broad discretion of the trial court to order a new trial where the verdict is against the weight of the evidence, remittitur practice is unnecessary and wasteful. *Id.* This Court is not bound by the *Firestone* decision since remittitur is largely a procedural issue, and the question of whether to grant a new trial is a federal procedural question to be decided by reference to federal law. *Ferren v. Richards Mfg. Co.,* 733 F.2d 526, 528 (8th Cir.1984).

versed; the second time, the jury deadlocked and was unable to return a verdict; the third time, the jury returned a verdict which is at issue on this appeal. Each trial was long, complicated, and emotional. Under these circumstances, we feel that a remittitur is a better alternative than requiring the district court to try this matter for the fourth time and to subject the parties to additional legal expenses. *See United States v. 47.14 Acres of Land,* 674 F.2d 722, 728 (8th Cir.1982); *Kropp v. Ziebarth,* 601 F.2d 1348, 1354–55 (8th Cir.1979); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2815 (1973) (quoting McCormick, Damages § 19 (1935)).

Accordingly, if within twenty days after issuance of the mandate herein appellees consent to a remittitur of $1 million, the judgment will stand affirmed as of the date of the judgment from which the appeal was taken. The appellees shall be entitled to interest and costs as provided by law. In the absence of such remittitur, the district court will vacate its judgment and award a new trial.

### F. The District Court's Alleged Bias.

■ Budd's final contention is that the trial court deprived Budd of a fair trial because it was hostile to the RH5° rim and was frustrated with presiding over this case for the third time. In support of this contention, Budd points to several passages in the transcript where the trial judge voiced his displeasure with Budd.

We disagree. Our careful review of the over 1,000 pages of transcript reveals an impartial, patient, and basically fair trial court. Every conference is recorded in the record; nearly every evidentiary ruling appears to be the product of a careful balancing of interests on the part of the trial court. The record is replete with the trial court's admonitions of both counsel, equally, for their unprofessional behavior. The court was careful, however, to deliver these only out of the presence of the jury. This Court understands the trial court's anger with both counsel.

This matter is remanded to the district court for action consistent with section E of this opinion. The mandate of this Court shall issue forthwith. Two-thirds of the costs of this appeal will be taxed to the appellants, and one-third to appellees.