# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 01-1146/01-1244

_____

Norman A. Ross,     *
    *
      Appellee/Cross-Appellant,   *
    *
    v.     *   Appeals from the United States
    *   District Court for the Western
Kansas City Power     *   District of Missouri.
& Light Company,     *
    *
      Appellant/Cross-Appellee.   *

_____

Submitted: December 12, 2001

Filed: June 10, 2002

_____

Before MORRIS SHEPPARD ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

BEAM, Circuit Judge.

Kansas City Power & Light Company (KCPLC) appeals the jury verdict entered in favor of Norman Ross in this 42 U.S.C. § 1981 employment discrimination claim. We affirm in part, and reverse in part.

## I. BACKGROUND

Ross, a black male, began working for KCPLC in 1979 as a "plant helper," and became a Meter Reader in 1980. Ross worked in that capacity for eighteen years. In

1988, Ross obtained a bachelor's degree in Systems Management from Rockhurst College. After receiving his degree, he also took additional computer classes from a community college. In 1998, he was temporarily promoted to the "CIS Plus Project" which involved testing KCPLC's "Y2K" software. In June 1999 he became a computer applications coordinator, and at the time of trial, he had been recently promoted to a programmer analyst.

At KCPLC, employees could apply for a promotion through either the Position Opportunity Program (POP) or the union bidding procedure, depending on the type of job. The POP was designed to allow in-house workers to apply for job openings within KCPLC. Under the POP, once an employee applies for a position, the application is reviewed by the human resources department to determine if an applicant meets the minimum qualifications for the position. If the minimum qualifications are met, the application is passed along for the interview process. Application for a union position was governed by the union bidding procedure as set forth in the collective bargaining agreement between KCPLC and the electrical workers union, the details of which are immaterial to our discussion of this case.

Although Ross applied for several promotions prior to bringing this action in 1998 the only two positions relevant to our discussion are the service coordinator position, and the business systems analyst position. In June 1997, Ross applied for the service coordinator position, which was a posted union position. A service coordinator acts as KCPLC's project manager for new installations or for modification of electrical service. The bid notice set forth the minimum job qualifications and required applicants to forward proof of completion of relevant courses or equivalent experience with their bids. Ross did not receive this position, ostensibly because he did not have the minimum educational qualifications (two practical electricity courses) for the position. Instead, Mary Follin and Russell Wiley were selected as service coordinators. Follin had only taken one of the required practical electricity

courses but instead was allowed to substitute equivalent classes to satisfy this requirement.

In December 1998, Ross applied for a business systems analyst position, posted through the POP program. The duties of this position included performing systems analysis design and testing, providing user training and support, and maintaining business systems databases. Ross's application was passed along by the human resources department for an interview with Ken Geier, the decision-maker for this position. Ross testified on cross-examination that after the interview, he sent Geier an email to clarify that the extent of his programming experience was on the "educational side" and not the "applied side." Geier ultimately selected Glenda Schnetzer for this position, apparently because of her superior qualifications.

In June 1998, Ross filed this action, alleging racial harassment, failure to promote, and retaliation. The district court granted summary judgment with respect to the harassment and retaliation claims, and left the failure to promote claims for the jury. At trial, the district court denied KCPLC's motion for judgment as a matter of law (JAML) and submitted five promotion claims–computer records administrator, computer applications coordinator, programmer analyst, service coordinator and business systems analyst–to the jury. The jury returned verdicts in favor of KCPLC on the first three positions and for Ross on the remaining two. The jury awarded Ross $6,000 in actual damages and $750,000 in punitive damages for the service coordinator position, and $10,000 in actual damages and $750,000 in punitive damages for the business systems analyst position. Following post-trial motions, the district court reduced the punitive damages awards to $120,000 and $200,000 respectively, and set attorney fees and costs.

On appeal, KCPLC argues that JAML should have been granted prior to jury submission because Ross was not as qualified as the successful applicants for the positions in question. Ross cross appeals, arguing for reinstatement of the punitive

-3-

damages award or the choice of a new trial on damages. Ross also appeals the amount of the district court's award of attorney fees and costs. Finally, Ross conditionally appeals the district court's grant of partial summary judgment, to be considered only if we reverse any part of the favorable jury verdict.

## II.    DISCUSSION

This court reviews the denial of a JAML de novo. Feltmann v. Sieben, 108 F.3d 970, 974 (8th Cir. 1997). We view the evidence in the light most favorable to the non-movant and give him the benefit of all reasonable inferences. Id. In an employment discrimination case, a court must render JAML when there is no legally sufficient basis for a "rational factfinder" to conclude the employer intentionally discriminated. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000).

Because there was no direct evidence of discrimination here, we apply the burden shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Yates v. Rexton, Inc., 267 F.3d 793, 799 (8th Cir. 2001) (there is direct evidence of discrimination only when there is specific link between challenged employment action and the alleged animus). To raise a presumption of discrimination in this failure-to-promote case, Ross must show that (1) he is a member of a protected group; (2) he was qualified and applied for an available position; (3) he was rejected; and (4) employees similarly situated but not part of the protected group were promoted instead. Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996). Once Ross establishes the prima facie case, the burden of production shifts to KCPLC, who must rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for Ross's rejection. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). If KCPLC meets that burden, Ross may win by proffering evidence that KCPLC 's reason was a pretext for intentional discrimination. Shannon, 72 F.3d at 682.

## 1.    Service Coordinator Position

KCPLC argues the district court erred in refusing to grant JAML on the service coordinator position.  KCPLC argues that Ross was not qualified for this position because he had not completed course work in Practical Electricity I and II.  The district court found, and we agree, there was evidence in the record that qualifications for jobs were occasionally waived if an applicant had satisfied the requirement through other course work or experience.  At trial, counsel elicited testimony from Ross to the effect that his course work and experience were similar enough to Practical Electricity I and II to satisfy this prerequisite.  Further, there was also evidence that KCPLC had accepted a successful applicant's  college physics course as a substitute for Practical Electricity II, even though there was no evidence that this physics class had electrical instruction.

Thus, Ross established his prima facie case for this claim,[1] and the burden shifted to KCPLC to produce a legitimate, nondiscriminatory reason for not promoting him.  KCPLC's stated reason was that Ross did not supplement his application for the position with proof of equivalent coursework in lieu of the practical electricity requirements.  While this is true, Ross also submitted evidence that the human relations department occasionally contacted applicants who appeared to be lacking a prerequisite to determine whether they had educational or practical experience that might satisfy the missing requirement.  Ross, however, was not contacted and given this opportunity to supplement his application.  The jury

---

[1]KCPLC argues that Ross only submitted evidence as to the race of Mary Follin, and not Wiley.  We agree with Ross that KCPLC did not make this argument to the district court in its motion for JAML, cf. Kaplon v. Howmedica, Inc., 83 F.3d 263, 266 (8th Cir. 1996) (issues adequately raise in JAML could be considered on appeal), and that regardless, there was sufficient evidence for the jury to infer Wiley's race in this case.

obviously believed Ross's evidence of pretext, as it was entitled to. We therefore affirm the jury verdict on this claim.

### 2.     Business Systems Analyst Position

We reverse the jury verdict in favor of Ross on this claim and direct the district court to enter JAML in favor of KCPLC for the business analyst position. While Ross again met his prima facie case, KCPLC countered with evidence that the candidate it selected, Schnetzer, was more qualified. Ross claims that evidence of his qualifications, Schnetzer's qualifications and the atmosphere of discrimination were all permissible factors allowing the jury to conclude that the employer's reason was pretextual. We disagree.

In addition to the minimum educational requirements, the business systems analyst position had the following posted special requirements: "Working knowledge of CIS Plus System and KCPL business practices/processes in Customer Services." The evidence showed that the HR department did pass along Ross's POP application, indicating that he met the bare minimum educational requirements for the job and he was eligible for an interview. However, Ross's own testimony indicates that the eventually successful candidate was more qualified. As earlier indicated, Ross admitted that he sent the decision-maker for this position, Ken Geier, an email to the effect that the extent of his programming experience for this position was "on the educational side and not the applied side." Geier determined that Schnetzer had experience with KCPLC's then-current CIS computer system and more than seven years of customer service experience. Ross had experience in neither of those areas. Geier also scored each candidate based on several criterion for the job, which included education and experience in several different areas. Out of a possible total score of 400, Schnetzer scored 317.5, while Ross scored 182.5.

-6-

These amount to legitimate nondiscriminatory reasons for selecting Schnetzer for the promotion instead of Ross, and no reasonable jury could conclude otherwise. Reeves, 530 U.S. at 149 (JAML appropriate where parties have been fully heard and there is no legally sufficient basis for a reasonable jury to find for the party on that issue). In the usual course of events, an employer will hire the most qualified candidate, and an employer, not a federal court, is in the best position to "[i]dentify[] those strengths that constitute the best qualified applicant." Duffy v. Wolle, 123 F.3d 1026, 1037-38 (8th Cir. 1997). We have oft repeated the maxim that the federal courts do not sit as super-personnel departments assessing the business judgments made by employers. E.g., Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998). Instead, the courts address "'[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment,'" which is "'whether the plaintiff was the victim of intentional discrimination.'" Evers v. Alliant Techsystems, Inc., 241 F.3d 948, 955 (8th Cir. 2001) (quoting Reeves, 530 U.S. at 153).

An employer is properly entitled to judgment as a matter of law "'if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision.'" Cha v. Henderson, 258 F.3d 802, 805 n.3 (8th Cir. 2001) (quoting Reeves, 530 U.S. at 148). Here the record conclusively reveals that Schnetzer's unique skills for this particular position were superior to Ross's. As noted, Schnetzer had seven years of customer service experience and experience in using the company's then-current CIS computer system, both of which were special requirements of this position. Furthermore, Schnetzer scored considerably higher than Ross on Geier's evaluation scale. These are adequate, and in fact, quite understandable, nondiscriminatory reasons for KCPLC's decision to promote Schnetzer instead of Ross. See, e.g., Gentry v. Georgia-Pacific Corp., 250 F.3d 646, 650-51 (8th Cir. 2001) (no evidence of discrimination in the promotion selection process where successful candidate graded higher on scored interview process). Accordingly, KCPLC is entitled to judgment as a matter of law for the business systems analyst position.

### 3.     Cross-Appeal

Ross cross appeals the remittitur of the punitive damages award, the district court's grant of partial summary judgment, and the amount of the district court's award of attorney fees and costs.  We review de novo the district court's determination of the constitutionality of punitive damages awards. Cooper Indus. Inc. v. Leatherman Tool Group Inc., 532 U.S. 424, 536 (2001); Callantine v. Staff Builders, Inc., 271 F.3d 1124, 1133 (8th Cir. 2001).

We review the grant of summary judgment on racial harassment and retaliation claims de novo, applying the same standard as the district court and examining the record in the light most favorable to the nonmoving party. Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 258 (8th Cir. 1996).

#### a.     Punitive Damages

Ross argues he is entitled to reinstatement of the entire punitive damages award, and in the alternative argues he should have been given the option of a new trial in lieu of remittitur.  KCPLC argues the punitive damages should not have been submitted to the jury, that the damages are still excessive following reduction and that it is therefore entitled to a new trial or a further reduction.

In Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999), the Supreme Court addressed the contours of the standard for when punitive damages should be submitted to the jury in an employment discrimination case.  Punitive damages may be recovered for employment discrimination if the employer engages in intentional discrimination with malice or with reckless indifference to the individual's protected rights.  Kolstad, 527 U.S. at 529-30.  However, a plaintiff does not have to establish

egregious misconduct on the part of an employer in order to have punitive damages submitted to the jury. Madison v. IBP, Inc. 257 F.3d 780, 795 (8th Cir. 2001).

The district court submitted punitive damages to the jury because it found that the evidence showed that KCPLC occasionally took "special efforts" on behalf of white applicants, including making further inquiry when their applications did not initially meet minimum qualifications. Further, there was evidence that KCPLC may have passed over qualified internal black candidates in favor of new college graduates who were white. In light of this evidence, the district court correctly submitted punitive damages to the jury. See id. at 795-96 (submission of punitive damages issue to jury appropriate where, even though company had anti-discrimination policy and procedures, those procedures were not followed by managers).

Following post-trial motions, the district court held that the jury's punitive damages award violated due process and reduced the award for the service coordinator position[2] from $750,000 to $120,000. The district court was required by the Due Process Clause to undertake an examination of the punitive damages award. BMW of North America, Inc. v. Gore, 517 U.S. 559, 572-74 (1996).[3] In BMW, the Court held that the Constitution provides an upper limit on punitive damage awards so that a person has "fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that . . . may [be] impose[d]." Id. at 574. The Court set out the following factors to be used in determining the

---

[2]Because we reverse the judgment in favor of Ross for the business systems analyst position, we need not discuss the punitive damages award for that claim.

[3]Although BMW involved a Fourteenth Amendment due process review of a state's imposition of punitive damages on a tortfeasor, we have previously applied the BMW analysis to review a federally imposed punitive damages award in an employment discrimination case. See Henderson v. Simmons Foods, Inc., 217 F.3d 612, 619 (8th Cir. 2000).

reasonableness of a punitive damages award: the degree of reprehensibility of the defendant's conduct; the ratio or relationship between actual harm inflicted on plaintiff and the punitive damages award; and civil penalties authorized for comparable misconduct. Id. at 575.

Here, KCPLC's reprehensibility, while enough for liability, was not enough for a punitive damages award which totaled a ratio 125:1 over the compensatory award. In BMW, the Supreme Court struck down a 500:1 ratio of punitive damages to compensatory damages as violative of the Due Process Clause of the Fourteenth Amendment. Id. at 582, 586. While the courts should not employ a mechanical mathematical approach in determining the reasonableness of punitive damages awards, id. at 582, we note that the district court's formula still results in a 20:1 ratio with the compensatory damages award. From our de novo review of the record, this is still too high for the conduct which occurred in this case. Thus, while we agree with the district court that a $750,000 award violated due process, we further reduce the punitive damages award from $120,000 to $60,000, resulting in a 10:1 ratio. Cf. Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 577-78 (8th Cir.1997) (reducing punitive damages from approximately 140:1 to a 10:1 punitive to compensatory ratio).

Ross's argument, based on Thorne v. Welk Investment, Inc., 197 F.3d 1205 (8th Cir. 1999), that he was entitled to the option of a new trial on damages, absent his consent to the district court's "remittitur" is unavailing. In Thorne we held that the district court erred when it remitted an excessive verdict without first obtaining the plaintiff's consent or offering the plaintiff the option of proceeding to a new trial. Id. at 1212. Here, while perhaps labeled as such, the action the district court took was not actually a remittitur, but instead was simply a reduction of the excessive punitive damages award in conformity with constitutional limits. See Johansen v. Combustion

<u>Eng'g, Inc.</u>  170 F.3d 1320, 1331-32 (11th Cir. 1999).  As the Eleventh Circuit explained:

> A constitutionally reduced verdict . . . is really not a remittitur at all.  A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts.  A constitutional reduction, on the other hand, is a determination that the law does not permit the award.   Unlike a remittitur, which is discretionary with the court . . . a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.

<u>Id.</u> at 1331 (emphasis in original).  While the traditional remedy of remittitur does require the plaintiff's consent in order to comport with the Seventh Amendment right to jury trial, <u>Thorne</u>, 197 F.3d at 1212,[4] the court's mandatory review of a punitive

----

[4]Although in <u>Thorne</u>, awards for both compensatory and punitive damages were reviewed and remitted or reduced, we do not think this case stands for a position contrary to our holding today.  In <u>Thorne</u>, we analyzed the district court's decision to reduce punitive damages separately from the analysis of the compensatory damages remittitur.  197 F.3d at 1211.  In upholding the remitted compensatory award, we found that the jury's verdict was excessive as a matter of law and noted that such verdicts were "monstrous" or "shocking."  <u>Id.</u>  For the punitive damages, however, we noted that the district court had correctly utilized the factors (from <u>BMW</u>) to determine constitutionality.  <u>Id.</u>  Thus, the compensatory damages and punitive award were clearly separate in the opinion, and consequently, we believe the portion of the opinion which held that the Seventh Amendment requires consent for a remittitur referred to the compensatory damages verdict only.  <u>Id.</u> at 1212.

Furthermore, the law in this circuit supports the notion that the district court's duty to review the constitutionality of punitive damages awards is independent of the Seventh Amendment constraints on the plaintiff's right to consent to remittitur.  <u>See</u> <u>Callentine</u>, 271 F.3d at 1134 (affirming the district court's reduction of punitive

-11-

damages award does not implicate the Seventh Amendment. The plaintiff's consent to a constitutional reduction of a punitive damages award is "irrelevant" because the court must decide this issue as a matter of law. Johansen, 170 F.3d at 1331. Accordingly, we affirm as modified the district court's reduction of Ross's punitive damages award.

### b. Harassment

Ross also argues the district court erred in granting summary judgment on his claims of a racially hostile environment and retaliation. Ross brought these claims pursuant to 42 U.S.C. § 1981. In analyzing a claim of hostile environment under section 1981, we apply the same standards as in a similar Title VII claim. Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000); Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 347 n.2 (7th Cir. 1999). Cf. Kim v. Nash Finch Co.. 123 F.3d 1046, 1063 (8th Cir. 1997) (following 1991 amendments to Civil Rights Act, legal theories of recovery for intentional discrimination under section 1981 and Title VII are "substantially identical").

To establish a claim for a racially hostile work environment, Ross must show he is a member of a protected group and was subjected to unwelcome race-based harassment which affected a term, condition, or privilege of employment. Ross must also show the employer knew or should have known of the harassment and failed to

---

damages verdict following constitutional review and despite plaintiff's objections to reduction); Kimzey, 107 F.3d at 578 n.5 (plaintiff not given option of new trial before reduction of punitive damages). Cf. Gorman v. Easley 257 F.3d 738, 749 (8th Cir. 2001) (district courts must undertake independent review of the evidence to determine whether it supports punitive damages); Pulla v. Amoco Oil Co., 72 F.3d 648, 658 (8th Cir. 1995) ("It is clear that an award of punitive damages is subject to review to determine whether it violates principles of substantive due process.").

take prompt and effective remedial measures to end the harassment. <u>Willis v. Henderson</u>, 262 F.3d 801, 808 (8th Cir. 2001). Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment. <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 786 (1998).

The district court found vague the evidence regarding racial jokes and cartoons as alleged in a letter from Ross to Joe Ann Alexander in the employee relations department, but only one such item was placed in Ross's mailbox. Ross alleges racist literature was circulated at KCPLC. However, the court was not supplied with exhibits displaying this material. Nor was there evidence in the record that Ross worked at the location where this racist material was allegedly circulated. There was evidence in the record that an employee called Alexander a "black bitch," but that Alexander was not bothered by this. Ross also complained about "mean spirited" and "intolerant" conversations regarding whether he would take Martin Luther King, Jr. Day as a holiday, and his opinion on racial relations. Although Ross made allegations that another employee wore a white hood, that black dolls were lynched from African-American employee mail slots, and that human excrement was put on the lockers of African-American workers, the district court found there was an utter lack of proof regarding each of these allegations. Finally, one KCPLC manager admitted using the word "nigger" at the workplace on one occasion, but there was no evidence Ross was present at the time.

The district court ruled that only three of the above events (the "bitch" comment, the Martin Luther King, Jr. Holiday comment, and the racial relations discussion) occurred during the relevant period of limitations–from 1993 through 1998, when this action was filed. The district court correctly noted that the latter two incidents were not objectively offensive within the meaning of <u>Faragher</u>, 524 U.S. at 786-87.

The first incident, the "black bitch" comment, was a singular event, not directed toward Ross, and there was no evidence it was repeated in Ross's presence. We agree with the district court that this particular one-time incident, while offensive, does not rise to the level of harassment necessary to prove a hostile environment. As the Faragher Court noted, "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" 524 U.S. at 788. Accordingly, we affirm the district court's grant of summary judgment on this issue.

### c.   Retaliation

In the order granting partial summary judgment, the district court noted that Ross had not responded to KCPLC's motion for summary judgment with regard to the retaliation claim and therefore construed the claim as abandoned. Ross moved for reconsideration of this ruling, and, after thoroughly examining the pleadings and determining that a retaliation claim was not adequately stated, the district court alternatively ruled on the merits of the claim.

Ross's retaliation claim, in essence, is that the denial of promotions was in retaliation for his participation in protected conduct. The applications for promotions in question were made on or after December 1996. The district court examined the record and found that Ross's "protected activity" consisted of the 1990 letter to Alexander and "complaints" made in the 1980's and early 1990's to a personnel representative, Charles James. James testified in a deposition that Ross complained about being passed over for promotions in the early to mid 1980's. James also testified that Ross was a "spokesperson" for racial discrimination in meter reading jobs. However, James left the company in 1995, and was not involved in any decisions regarding Ross's applications for promotions after 1996.

-14-

The elements of a retaliation claim under section 1981 are (1) protected activity, (2) subsequent adverse employment action, and (3) a causal relationship between the two. Kim, 123 F.3d at 1060. We agree with the district court's conclusion that the protected activity in question here, which occurred in the early 1990's at the latest, does not have the requisite causal connection to the denial of promotions occurring after 1996. See Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999) (four month gap "weakens" inference that retaliation occurred in adverse employment action). Here, the gap between protected activity and adverse employment action is measured in years, not months. In light of this, there is not an adequate causal connection between the protected activity and the denial of promotions as a matter of law. We therefore affirm the district court's grant of summary judgment on Ross's retaliation claim.

### d. Attorney Fees

Finally, Ross complains about the amount of prevailing party attorney fees awarded by the district court, which awarded Ross $168,551.78 in attorney fees and $14,700.79 in costs. Prevailing parties are entitled to an award of reasonable attorney fees based on the number of hours *reasonably* expended multiplied by a *reasonable* hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). "It remains for the district court to determine what fee is 'reasonable.'" Id. We have reviewed the record and the district court's extremely thorough and well-reasoned order on attorney fees and costs and find that the district court did not abuse its considerable discretion in this instance.

## III.   CONCLUSION

For the foregoing reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.