# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-1063
_____

George Tedder

*Plaintiff - Appellee*

v.

American Railcar Industries, Inc.

*Defendant - Appellant*

_____

No. 13-1064
_____

George Tedder

*Plaintiff - Appellant*

v.

American Railcar Industries, Inc.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Jonesboro

_____

Submitted: September 24, 2013
Filed: January 9, 2014

_____

Before WOLLMAN, BEAM, and SMITH, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

American Railcar Industries, Inc. (ARI), appeals from a district court[1] order denying its motion for judgment as a matter of law or, in the alternative, a new trial, and granting a partial remittitur of damages. George Tedder cross-appeals from the same order, challenging the remittitur. We affirm.

## I.

Tedder worked for ARI as a welder. On April 24, 2008, Tedder was sitting on a table in the welding shop when another ARI employee crashed a golf cart into it, knocking Tedder off the table and into a metal pipe stand. Tedder immediately complained of back pain and eventually sought medical treatment for his symptoms. Since that time, Tedder has remained physically disabled and in pain.

Tedder has a history of work-related back injuries that predate the accident. In the late 1970s, Tedder injured his back in an industrial welding accident and was unable to work for three years. Tedder returned to his job only after being retrained for lighter duty work. In April 2000, Tedder again injured his back when he slipped while using a pry bar. Tedder visited the emergency room and was diagnosed with acute lower back pain. Finally, in April 2006, Tedder injured his back when he slipped on a piece of metal pipe. Tedder sought treatment from a chiropractor after the injury. According to the testimony of several lay witnesses, Tedder was not

_____

[1]The Honorable Brian S. Miller, Chief Judge, United States District Court for the Eastern District of Arkansas.

experiencing any symptoms relating to these injuries immediately prior to the golf cart accident.

Tedder sued ARI on September 2, 2009, alleging that the golf cart accident had caused his debilitating back pain. ARI admitted that its employee had been negligent but contested causation and damages, arguing that Tedder's three prior back injuries, his history of smoking and obesity, and his participation in active leisurely pursuits like bowling and hunting could also have caused his symptoms.

At trial, Tedder called seven lay witnesses to testify that they had noticed a marked deterioration in Tedder's physical condition after the golf cart accident. Tedder also called Gregory Ricca, M.D., an expert witness who opined that the golf cart accident was the medical cause of Tedder's symptoms. Dr. Ricca based his opinion on a differential diagnosis, a diagnostic method whereby a physician identifies all scientifically plausible causes of a patient's symptoms, then rules out improbable causes until the most likely cause remains. On cross-examination, ARI asked Dr. Ricca whether he knew about Tedder's prior back injuries and whether knowledge of those injuries would have been important to a differential diagnosis. Dr. Ricca admitted he had not heard about Tedder's injuries in 2000 or 2006 and that knowledge of those injuries would have been critical to such a diagnosis. On redirect examination, Dr. Ricca qualified his earlier opinion by adding:

> If the 2004 [sic] or 2000 back pain episodes continued up until his event, then I would not be able to say the event caused it. But if he were asymptomatic prior to the event, he had the event, he had a reasonable association between the event and the injury, the injury he describes is consistent with his symptoms, then I would say the event or injury caused the symptoms that needed treatment.

ARI objected to Dr. Ricca's testimony, arguing that Dr. Ricca could not make a differential diagnosis based solely on Tedder's subjective statements. The court overruled ARI's objection.

The jury returned a verdict for Tedder and awarded him the following damages:

- $500,000 for the nature, duration, extent, and permanency of his injury.
- $50,509.20 for past medical expenses.
- $100,000 for pain, suffering, and mental anguish experienced in the past.
- $737,500 for pain, suffering, and mental anguish reasonably anticipated to be experienced in the future.
- $121,879 for past wages/earnings lost.
- $700,000 for future wages/earnings lost.
- $75,000 for visible effects of his injuries.

After the verdict, ARI moved for judgment as a matter of law, a new trial, or remittitur. ARI argued that the court should have excluded Dr. Ricca's testimony as unreliable and that without Dr. Ricca's testimony no reasonable jury could have found causation. ARI also alleged that it was entitled to a new trial or to remittitur because certain evidentiary errors at trial had led the jury to award Tedder excessive damages. The district court denied ARI's motion for judgment as a matter of law, concluding that Dr. Ricca's testimony was admissible and sufficient to send the issue of causation to the jury. The court agreed with ARI that passion and prejudice had influenced the jury verdict but used somewhat different reasoning to arrive at its conclusion:

Sitting through the trial, one thing became very obvious: the jury disliked defense counsel. Lead counsel, who hailed from St. Louis, Missouri, was extremely abrasive to everyone in the courtroom. During the trial, a number of the jurors turned away when defense counsel addressed the witnesses and some routinely "rolled their eyes" when

-4-

counsel spoke. While there is no doubt that the jury had sufficient evidence to find ARI liable, it is clear that the verdict was meant not only to compensate Tedder for his injuries, but also to send a message to defense counsel that their behavior was unacceptable.

D. Ct. Order of Dec. 5, 2012, at 7. The court then remitted the award for the nature, duration, extent, and permanency of injury from $500,000 to $250,000 and the award for future pain, suffering, and mental anguish from $737,500 to $250,000, capping both at two and one-half times the jury's award for past pain, suffering and mental anguish. Id. at 8. The court denied ARI's request to remit the awards for future wages/earnings lost and for the visible effects of Tedder's injury.

## II.

ARI asserts that the district court should have excluded Dr. Ricca's differential diagnosis as scientifically unreliable under the standards set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-94 (1993). "We review for abuse of discretion rulings concerning the admissibility of testimony that is offered as expert opinion." Ahlberg v. Chrysler Corp., 481 F.3d 630, 635 (8th Cir. 2007).

Properly conducted differential diagnoses satisfy the Daubert standard. Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1208 (8th Cir. 2000). Indeed, differential diagnoses are "presumptively admissible," and "a district court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid." Glastetter v. Novartis Pharm. Corp., 252 F.3d 986, 989 (8th Cir. 2001) (per curiam) (citation omitted). ARI advances three arguments that Dr. Ricca's differential diagnosis was scientifically invalid, which we address in turn.

First, ARI argues that because Dr. Ricca was unaware of Tedder's 2000 and 2006 back injuries before ARI cross-examined him about them, Dr. Ricca's

-5-

differential diagnosis failed to eliminate these possible alternative causes of Tedder's symptoms. A failure to consider alternative potential causes of an injury or symptom can render a differential diagnosis scientifically invalid, Bland v. Verizon Wireless, (VAW) L.L.C., 538 F.3d 893, 897-98 (8th Cir. 2008), but no such failure occurred here. Dr. Ricca's testimony indicates that he took Tedder's prior back injuries into consideration after learning about them at trial and ultimately reiterated his diagnosis, conditional on Tedder's being asymptomatic prior to the injury. That Dr. Ricca learned about Tedder's injury history at trial rather than from Tedder himself does not render Dr. Ricca's diagnosis unreliable. See Fed. R. Evid. 703 (permitting an expert to rely on data that he "has been made aware of" at trial). There is nothing to indicate that Dr. Ricca lacked sufficient time between cross-examination and redirect examination to competently assimilate Tedder's complete injury history into his diagnosis. Indeed, ARI acknowledges that Dr. Ricca modified his diagnosis to account for this new information. ARI's objection to his diagnosis thus amounts to an assertion that Dr. Ricca did not accord Tedder's injury history as much weight as ARI would have liked. This disagreement is no basis for excluding Dr. Ricca's opinion.

Next, ARI argues that Dr. Ricca's diagnosis was unreliable because he relied solely on Tedder's description of his symptoms and the temporal connection between these symptoms and the accident. See In re Baycol Prods. Litig., 596 F.3d 884, 891 (8th Cir. 2010). The record shows, however, that Dr. Ricca also relied on leg-raise tests, a CT scan, and the reports of other physicians in making his diagnosis. Patient-reported symptoms may support part of a diagnosis as long as that diagnosis also incorporates other sources of information. See Kudabeck v. Kroger Co., 338 F.3d 856, 862 (8th Cir. 2003) (affirming the admission of expert testimony where the expert relied on the patient's self-reported medical history, chiropractic tests, and physical observations of the patient).

Finally, ARI argues that because Dr. Ricca was unaware of Tedder's 2000 and 2006 back injuries when he made his initial diagnosis, he simply did not have enough data to provide a reliable causation opinion. See Fed. R. Evid. 702. As discussed above, however, Dr. Ricca's ultimate diagnosis took into account the information ARI complains he lacked, for he explicitly referred to both the 2000 and 2006 injuries in giving his qualified re-diagnosis on redirect examination. The district court therefore did not err in admitting Dr. Ricca's testimony.

III.

ARI next asserts that, even if Dr. Ricca's testimony was properly admitted, the district court should have granted its renewed motion for judgment as a matter of law because Dr. Ricca's ultimate diagnosis was too equivocal to permit a reasonable jury to find causation. We review *de novo* the district court's denial of a motion for judgment as a matter of law, using the same standard that the district court applied. Schaffart v. ONEOK, Inc., 686 F.3d 461, 470 (8th Cir. 2012). "We must affirm the jury's verdict unless, after viewing the evidence in the light most favorable to [Tedder], we conclude that no reasonable jury could have found in [his] favor." Quigley v. Winter, 598 F.3d 938, 946 (8th Cir. 2010) (quoting Heaton v. The Weitz Co., 534 F.3d 882, 887 (8th Cir. 2008)) (internal quotation marks omitted). "In reviewing the sufficiency of evidence in a diversity case, we apply state law." Burke v. Deere & Co., 6 F.3d 497, 511 (8th Cir. 1993).

Under Arkansas law, the conditional nature of an expert's testimony does not render it equivocal; rather, a conditional diagnosis merely requires the jury to find that the conditional fact exists to consider the diagnosis. See St. Paul Fire & Marine Ins. Co. v. Prothro, 590 S.W.2d 35, 40 (Ark. App. 1979) ("[T]estimony of a medical expert witness that an injury could have been caused by a certain event, together with the corroborating evidence of a layman as to those facts concerning the injury which

a layman is capable of observing may be sufficient to allow the issue of causation to be submitted to the jury." (quoting Robertson v. LaCroix, 534 P.2d 17, 21 (Okla. 1975))). Much as in Prothro, the jury in this case could rely upon lay testimony to conclude that Tedder was asymptomatic prior to the accident and upon Dr. Ricca's testimony to conclude that Tedder's lack of symptoms prior to the accident tended to exclude other potential causes of his symptoms. Arkansas law permits this inference.

## IV.

The parties agree that the district court abused its discretion in partially remitting the jury's damages award. They disagree, however, as to the consequences thereof. ARI asserts that a new trial was required or that damages should have been remitted even further, while Tedder asserts that district court should have left the jury verdict intact.

## A.

We first address ARI's contention that the district court was required to grant a new trial after concluding that passion and prejudice had influenced the jury verdict. "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." Sanford v. Crittenden Mem'l Hosp., 141 F.3d 882, 884 (8th Cir. 1998) (quoting Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980) (per curiam)). Our review of the district court's denial of ARI's motion for a new trial is therefore "extraordinarily deferential." Id.

We favor new trials over remittiturs when a court finds that passion or prejudice has influenced a jury's damage award on the theory that such passion or prejudice may also have influenced the jury's determinations in other phases of the trial. Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005) ("[A]bsent

-8-

unusual circumstances, a remittitur is not appropriate when there is a finding of passion or prejudice."). This preference is qualified, however, by a court's discretion to consider equities when deciding between remittitur and a new trial. See Parsons v. First Investors Corp., 122 F.3d 525, 529 (8th Cir. 1997) ("[A]lthough passion may have affected [the] verdict, 'an opportunity to reduce the award as an alternative to a new trial might well be offered . . . wherever the trial judge is satisfied with the justness of the result on the question of liability.'" (quoting McCormick, Damages § 19 (1935))); see also Der v. Connolly, 666 F.3d 1120, 1126 (8th Cir. 2012) ("The key question in determining whether a new trial is warranted is whether it is necessary to prevent a miscarriage of justice." (quoting Haigh v. Gelita USA, Inc., 632 F.3d 464, 471 (8th Cir. 2011))). Thus, we have affirmed a district court's decision to remit damages after finding that passion and prejudice had influenced the jury verdict, when there was no risk that the jury's prejudice influenced the liability determination, a new trial would be complex and costly, and ten years had elapsed between the cause of action and the appeal. Parsons, 122 F.3d at 529. Similarly, we have held that a remittitur was required in the face of evidence that passion and prejudice had influenced a jury verdict, when granting a new trial would have subjected the parties to a fourth trial. Hale v. Firestone Tire & Rubber Co., 820 F.2d 928, 936-37 (8th Cir. 1987).

We believe this case presents a similarly unusual circumstance permitting remittitur as opposed to a new trial. ARI admitted that its employee was negligent and contested only causation. Thus, the jury's passion and prejudice could not have affected any determination about whether ARI breached its duty of care. Rather, the only other determination that passion and prejudice may have affected, aside from damages, was the jury's finding of causation. The determination of causation, however, does not involve value judgments about reasonableness. Such a determination is thus arguably more resistant to being influenced by passion and prejudice than other elements of the case and does not raise the same level of concern

-9-

that attends a reasonableness determination. This is especially true in this case, where the passion and prejudice arose in response to defense counsel's behavior at trial and involved circumstances entirely extrinsic to the evidence. This is not a case in which the jury was shown inflammatory evidence and thus could not consider the evidence rationally. Rather, it is a case in which the jury manifested its ire at defense counsel's conduct via its body language. Whether justified or not, we do not believe that the jury's animus was so strong as to deprive it of its capacity for rational thought and considered deliberation regarding its findings on the other aspects of the case.

Moreover, there would be an inherent unfairness in subjecting Tedder to a new trial based solely on the abrasive behavior of ARI's counsel. We have previously held that a civil litigant may not seek a new trial based on the alleged deficiency of his own counsel. Glick v. Henderson, 855 F.2d 536, 541 (8th Cir. 1988) ("[The] remedy for any ineffective assistance of counsel [in a civil case] is a suit against [the party's] attorney for malpractice, not a new trial . . . ."). That principle applies with equal force here, where the grant of a new trial to the offending party would deprive its blameless adversary of a well-won victory. While these circumstances are perhaps not as prejudicial as those in Hale, where a new trial would have been the fourth between the parties, we should also remember who the plaintiff in this case is. Tedder is not a corporation with perpetual life and an army of in-house litigators; he is an aging, disabled man who has spent the last four years of his life in litigation. To scuttle Tedder's victory on the merits solely because of his adversary's deficiencies would severely prejudice him for reasons that he, along with many others, would find hard to fathom. Thus, we conclude that the district court did not err in denying the motion for new trial.

B.

We next address whether the district court erred in remitting damages. "The scope of review of a district court's damage award 'is extremely narrow' and the

-10-

district court's award may not be reversed 'except for a manifest abuse of discretion.'" Taylor v. Otter Tail Corp., 484 F.3d 1016, 1019 (8th Cir. 2007) (quoting Peoples Bank & Trust Co. of Mountain Home v. Globe Int'l Pub., Inc., 978 F.2d 1065, 1070 (8th Cir. 1992)). Federal law governs whether remittitur is appropriate, Parsons, 122 F.3d at 528, but we "refer to the law of the forum state when determining the inadequacy or excessiveness of a jury verdict," Vanskike v. Union Pac. R. Co., 725 F.2d 1146, 1150 (8th Cir. 1984).

Tedder relies on McNair v. McNair, 870 S.W.2d 756, 761-62 (Ark. 1994), for the proposition that, under Arkansas law, a party whose conduct incites the passion or prejudice of a jury may not later complain that the jury verdict is excessive. Tedder's reliance on McNair is misplaced for two reasons. First, although Tedder attempts to phrase his argument in terms of state law by referring to a party's right to complain about an excessive verdict, his argument ultimately concerns the availability of remittitur, which is a procedural question governed by federal law. See Hale, 820 F.2d at 936 n.1. Second, even if we were to accept Tedder's state-law characterization, McNair is factually distinguishable. In McNair, defense counsel made the strategic choice to introduce inflammatory evidence, and the court held that counsel was not entitled to complain of its effect. 870 S.W.2d at 762. McNair thus stands for the proposition that remittitur is unavailable to a party who intentionally inflames the passion and prejudice of a jury.

By contrast, remittitur may be appropriate when a party's counsel inadvertently inflames a jury's passion and prejudice. Tedder cites no federal or state case, nor have we found one, barring remittitur in these circumstances. Defense counsel's abrasive personality apparently was an inherent part of his nature, not a trial tactic, and "consideration must be given to whether [counsel's acts] were inadvertent or deliberate, designed to inflame and prejudice the jury, or whether they unintentionally may have done so." State v. Green, 428 P.2d 540, 546 (Wash. 1967). Moreover, remittitur does not prejudice Tedder in the same way that a new trial would.

-11-

Although it reduces his recovery, remittitur spares Tedder from the ordeal of another jury trial and does not jeopardize his victory on the merits. The district court thus did not err in entertaining ARI's motion for remittitur.

Tedder next asserts that the nonverbal cues of several jury members were insufficient to support the district court's finding that the jury acted out of passion or prejudice. Although more elaboration by the district court regarding which specific acts by jury members gave rise to an inference of passion or prejudice would have been of great assistance to us, we acknowledge that much of the evidence supporting this inference consisted of the district court's observations of the jury's general demeanor, observations that do not necessarily lend themselves to written expression. In other words, perhaps one just had to be there. With nothing to contradict the district court's findings, we therefore accept its conclusion that the jury's dislike of defense counsel influenced its decision on damages.

Lastly, Tedder alleges that the evidence supports the jury's damage award. To the contrary, we find persuasive the district court's conclusion that the jury "pulled out of the air" its damage awards of $500,000 for the nature, duration, extent and permanency of Tedder's injury and $737,500 for pain, suffering, and mental anguish reasonably anticipated to be experienced in the future. D. Ct. Order of Dec. 5, 2012, at 8. Tedder does not provide any specific basis for the jury's award of $500,000. Tedder does note that the $737,500 amounts to $25,000 per year for the rest of his expected life (29.5 years), but he does not provide any basis for the $25,000 figure.

Additionally, the total amount the award ($2,284,88.20) far exceeded what Tedder's counsel proposed ($1,146,326) during closing arguments. While the jury is entitled to award damages in excess of a party's request, see Troutman v. Modlin, 353 F.2d 382, 384-85 (8th Cir 1965), a grossly upward departure can support an inference that an award is excessive, see Dossett, 399 F.3d at 946. Thus, we believe the district court did not err in remitting as it did the awards for the nature, duration,

-12-

extent, and permanency of Tedder's injury and for pain, suffering, and mental anguish reasonably anticipated to be experienced in the future.

ARI, for its part, argues that the awards of $700,000 for future wages/earnings lost and $75,000 for visible effects of Tedder's injury are unsupported by the evidence and should be remitted. We disagree. Tedder's economist gave a "conservative" estimate of Tedder's lost earnings as $582,654, and the jury was within its rights to conclude that Tedder's actual damages exceeded this conservative estimate. Witnesses also testified that Tedder developed a noticeable limp after the accident, which constitutes a visible effect of injury. The district court thus did not err in refusing to remit these awards.

V.

The judgment is affirmed.

_____